UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | CASE NUMBER 3:24 CR0083 (KAD) |
|---|---|---|
| vs. | : | |
| KYLE PETERSEN | : | JUNE 16, 2025 |

## DEFENDANT'S SENTENCING MEMORANDUM

### I. INTRODUCTION

Upon being released from the Bureau of Prisons in the Spring of 2021, Kyle Petersen appeared to be heading in a positive direction. While serving a federal drug sentence in the BOP, he learned a viable trade and had accrued more than 800 hours as a plumbing apprentice to qualify for the exam to obtain his journeyman's license. After his release from prison, Kyle landed a very nice job at Rooterman Plumbing in Newington, where he was able to earn a decent wage. By 2024, he was working 7 days a week, earning over $100K, and close to qualifying for his Master's plumbing license.[1]

Unfortunately, not everything was sunshine and roses in his life. Tragically, both his sister and brother passed away from fentanyl overdoses within a year of each other. Kyle had only been home from prison for approximately 9 months, and had just purchased a home in December of 2021, when his sister passed away in February of 2022. After investing his initial savings on the downpayment of the home he had just bought, there wasn't any money left in his savings account. With his sister's passing Kyle felt the need to honor her with the respect that accompanies a proper funeral. It's ironic that he turned to selling drugs to generate the quick

---

[1] Kyle did not obtain his journeyman's license until approximately June of 2022.

1

cash he needed to accomplish this well-intentioned feat. And like an alcoholic who is sober for many years but then relapses after consuming one drink, once Kyle entered this nefarious world again and experienced the "high" from accruing easy money when compared to the hard labors of his plumbing vocation, he relinquished everything that he had accomplished through lawful means and began delving into this despicable trade.

On April 2, 2025 Kyle Petersen entered a guilty plea to Count One of the Indictment which charges Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§841 (a)(1); 841 (b)(1)(A)(viii); and 846. Since he was on supervised release at the time of the federal offense, Kyle also faces a violation of his supervised release. It is anticipated that Kyle will admit the violation on the date of his sentencing for the substantive offense. Accordingly, he faces sentencing on the underlying federal drug offense as well as on the violation of supervised release charge. Throughout the pendency of this matter, Kyle has been detained at Wyatt Detention Facility, and during his incarceration he's worked as a pod worker and received excellent work reviews, as well as participating in prison programming.[2] Kyle is clearly on the older side of most offenders, and he understands the Court must consider not only the circumstances of the underlying offense, but also the fact that he was on supervised release when the charged offense is alleged to have occurred. Kyle has a dated criminal history, aside from the two federal drug offenses, and there is no reported violence on record. Notwithstanding the seriousness of these crimes, he is asking the Court to consider the positive reports from his time on supervised release, including his steady employment, and rendering negative drug screens.

---

[2] Kyle's received 1 disciplinary ticket for possessing pruno (an improvised prison alcohol).

Kyle's sentencing is scheduled for July 3, 2025 at 10:30 am. In accordance with Rule 32(o) of the Local Rules of Criminal Procedure the defendant respectfully submits this memorandum to aid the Court and in support of his request for a total effective sentence of 87-month.[3] Such a sentence would be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. See 18 U.S.C. §3553(a).

## II. SENTENCING GUIDELINES

The offense of conviction, Conspiracy to Distribute and to Possess with Intent to Distribute 500 Grams or More of Methamphetamine, Cocaine, Fentanyl and protonitazine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii), 841(b)(1)(C), and 846, carries a mandatory minimum sentence of 10 years. It should be noted that the PSR reflects a lower total offense level than the parties calculated in their plea agreement resulting from an error in the stipulated methamphetamine quantity. The parties entered into a stipulation that the defendant's attributable quantities of methamphetamine, cocaine, MDMA, fentanyl and protonitazine totaled at least 3,000 kilograms but less than 10,000 kilograms of converted drug weight resulting in a base offense level of 32.[4] After 3-levels are subtracted for acceptance of responsibility from the probation officer's base offense level of 30, the defendant's total offense level is 27. With a criminal history of III, his guideline range is calculated at 87-108 months. The defendant's violation of supervised release is considered a Gade A violation. Accordingly, with a CHC of III, he faces a guideline imprisonment range of 27-33 months. The defendant understands that the Court has discretion to order the violation sentence to run concurrently,

---

[3] Counsel understands the charge that Mr. Petersen has entered a pleaded guilty to carries a mandatory minimum of ten-years. However, Mr. Petersen requests the low end of the guideline range that is calculated based on the total offense level and his criminal history.

[4] The probation officer however has determined a converted drug weight of 2,967 kilograms, resulting in a base offense level of 30.

3

consecutively or partially concurrently with the sentence of the substantive drug offense. If the Court considered imposing a low end of the guideline sentence on both charges and runs the supervised release violation (27 months) concurrently to the substantive drug offense, his sentence would still be higher than the similarly situated defendants referenced in ¶102 of the PSR. According to the Judiciary Sentencing Information (JSIN) database, the average length of imprisonment imposed is 73 months. Conversely, if the Court imposed low end guidelines sentences on both cases and them consecutively to each other, the defendant's total effective sentence would be also lower than mandatory minimum of 120-months.

At the time of his change of plea, Kyle addressed the Court and raised his concerns with the manner in which the methamphetamine guidelines are calculated. He again asserts his objection below to the harsh sentences that result from the meth guidelines.

a. <u>Disagreement with Methamphetamine Guideline Calculation</u>

The plea agreement and PSR reflects five different types of drugs that were involved in this offense; methamphetamine, cocaine, MDMA, fentanyl, and protonitazine. To calculate a defendant's guidelines when different drugs are alleged in the indictment, the manual sets forth the process by which to convert the drugs to a marijuana drug weight. In this case, it's the methamphetamine quantity that drives the guidelines and sets forth a 10-year mandatory minimum sentence.[5] While the statutory penalties for most drug types are based solely on drug quantity, the statutory penalties for methamphetamine are also based on the purity of the substance involved in the offense. The drug quantity table for methamphetamine is broken down into three categories: "ice"; "methamphetamine (actual)"; and Methamphetamine

---

[5] The fentanyl quantity of 42.762 grams would only trigger a 5-year mandatory minimum sentence.

4

(mixture). For example, 50 grams of actual methamphetamine triggers a 10-year mandatory minimum sentence; as does 500 grams of a mixture and substance containing a detectable amount of methamphetamine. See U.S.S.G. §2D1.1 - Drug Quantity Tables. As the quantity thresholds indicate, two different 10-to-1 quantity ratios set the mandatory minimum penalties for methamphetamine trafficking offenses. First, the quantity of substance triggering the ten-year minimum is ten times the quantity triggering the five-year minimum. Secondly, the quantity of methamphetamine mixture triggering each mandatory minimum is set at ten times the quantity of the pure controlled substance triggering the same statutory minimum penalty. The effect of this 10-to-1 quantity ratio is that the weight of the **pure substance** will control the statutory penalty whenever the purity of a methamphetamine mixture **exceeds ten percent**.

It appears that the United States Sentencing Commission's intent was to punish the drug trafficker who sold methamphetamine containing higher purity levels. This would make sense because the higher the purity, the greater the potency of the drug would be. However, here the purity of the methamphetamine that is attributable to the defendant was 4.5% for 16.79 grams, and 4.6% for 1,155 grams. (See Exhibit A - DEA Lab Reports). These are relatively low purity levels. Nationwide federal prosecutions of methamphetamine offenses, for 2023 (the last year for which data is available), is an average methamphetamine purity of 93.2% (with a *median* purity of 98.0 percent). The substances for which Mr. Petersen has pleaded guilty have a methamphetamine purity range of approximately 4.55%, which is 0.05 (five one hundredths) of the nationwide average purity of 93.2%. Taking the total weight of the methamphetamine mixture set forth in the PSR at ¶26 (1,171.80 grams), and then calculating the actual methamphetamine quantities from the DEA lab reports, the total amount of pure methamphetamine substance attributable to the defendant equates to 53.1 grams +/- 6.4 grams

(or 46.7 grams), and 0.755 grams +/- 0.091 grams (or 0.664 grams). Factoring in the +/- deviation, and considering also the rule of lenity, the total weight of pure methamphetamine is 47.36 grams. Id. Applying the U.S.S.G. drug tables, if the defendant had been arrested only for the 47.36 grams of actual methamphetamine, and no other drugs, his offense level would be 28, and he'd be facing only a five-year mandatory minimum sentence. See U.S.S.G. §2D1.1(6). In other words, this purity levels falls under a Title 21 U.S.C §841 (b)(1)(B) offense. So, it appears the "cut" in the mixture is what the defendant is being punished for, NOT the actual methamphetamine. The defendant has attached an exhibit that sets forth this argument. (See Exhibit B). The chart that the defendant created, using the amount of actual methamphetamine that was recovered by authorities (47.36 grams), establishes that as the purity levels decrease the guideline offense level increases, and that the 10:1 ratio also increases to 200:1. There is no empirical data or facts to support the argument that an offender with the lowest form of purity of methamphetamine should face a harsher period of confinement.

The defendant acknowledges that when the other drugs are included (MDMA, cocaine, fentanyl, bromazolam, and protonitazine), and one uses the 47.36 grams of actual methamphetamine, the converted drug weight would total 1,570.68 kilograms. This quantity would still fall under the 1,000-3,000 kilograms of converted drug weight that probation calculated, though on the lower end. Moreover, the offense level would still be 30. However, he would still only be facing a mandatory minimum sentence of 5-years.

The defendant understands he's facing a 10-year mandatory minimum sentence, although he doesn't agree with the whole methamphetamine guideline calculation process. Nonetheless, he is asking the Court to consider this argument when determining his sentence on the substantive charge in conjunction with the supervised release violation. Accordingly, the

6

defendant respectfully asks the Court to disregard the mandatory minimum guideline and impose a total effective sentence of 87-months. In other words, he's asking the Court to impose the low end of the guideline, and to run the supervised release violation concurrently to the sentence for the substantive drug offense.

### III. NATURE AND CIRCUMSTANCE OF THE OFFENSE

Kyle Petersen's drug activity is well-documented in the presentence report, and he accepts full responsibility for his conduct and the drug quantities set forth in the presentence report. Kyle recognizes that he made a very bad decision when he returned to buying drugs off the dark web and then redistributing them in his community. He also understands how hypocritical his actions appear to the Court when two of his siblings, who he purportedly cared about and wanted to honor with proper funerals, died from drug overdoses. Regrettably, his childhood experience of being raised by parents who were disengaged in their children's lives more than likely played a part in corrupting his innocence and influenced his behavior, to a degree, as an adult. One can only hope that the lengthy prison sentence Kyle faces will finally correct his poor decision making and illegal conduct so that this type of behavior doesn't repeat itself again in the future. Otherwise, he will have squandered what appears to be a very promising future employment opportunity in the plumbing field.

### IV. HISTORY AND CHARACTER OF THE DEFENDANT

Kyle Petersen stands before this court as a 39-year-old man who will be well into his middle-aged years upon his release from prison. In recounting his life's story to the probation officer during the presentence interview, one can see the importance that parental guidance and care can have on a child. As children, Kyle's mother and father provided no direction towards him or his siblings, allowing the youngsters to skip school or remain in the streets late into the

night without imparting any form of discipline for this behavior. By the age of eleven, Kyle became very aware that his parents just didn't care about their children. His father would frequently get drunk in the evening hours after work, or his parents would openly smoke marijuana in the home in front of the children. Although the children were provided with food and shelter, there was a lack of love and affection exhibited by either parent. When the probation officer asked Kyle to describe his parents, his response was; "They didn't do nothing for me. Nothing to help guide us kids. We had to fend for ourselves". The resentment and animosity Kyle feels towards his parents still resonates with him today, more than 25 years later.

Once Kyle was cognizant that there would be no repercussions for his behavior, truancy became a recurrent theme in his young life. He was a bright boy, but found school to be boring and unchallenging, so he simply chose not to attend. This led to several juvenile referrals and detentions. At the age of eleven, Kyle began this revolving door in and out of juvenile detention facilities for truancy issues. He spent approximately one year at Waterford Country School which he completed successfully. He was then committed on another juvenile matter to Hartford Juvenile Detention. After a few months of confinement, Kyle was sent to Connecticut Junior Republic, where once again, he absconded. As punishment Kyle was committed for two years to Long Lane, a prison-type facility for juvenile delinquents. Once released from Long Lane, Kyle finally realized the State of Connecticut would hold him accountable for his truant behavior, so he agreed to attend New Britain High School for a brief period before dropping out at age 16. He eventually obtained his GED after leaving school.

As the Court can see from Kyle's criminal history, there were two convictions in his later teen years for marijuana possession, and then in his mid-twenties, he was convicted of a marijuana sale offense, for which he received a three-year prison sentence. It appears that Kyle

8

appealed this state sentence and was out on bond during the pendency of the appeal process. During this period Kyle escalated his drug activity that coincided with his heavy prescription pill use. Kyle began abusing significant quantities of Percocet, Vicodin, and Oxycontin pills, and to obtain cheaper quantities, he started buying them off the dark web. But then his drug purchases expanded to include fentanyl, MDMA, oxycodone and Xanax that he sold to his close friends. A federal narcotics investigation resulted in his apprehension, and for the quantities Kyle purchased and distributed, he received a 10- year prison sentence.

Fortunately, Kyle utilized his time wisely in federal prison and took advantage of the vocational training that was offered at the Danbury facility. This was quite beneficial to him, as he now acquired a marketable skillset once he was released into the community. To his good fortune, the period of Kyle's confinement occurred during the COVID pandemic, so after serving approximately five years of the sentence, he was approved for home confinement placement. Upon returning to the community, Kyle quickly found a plumbing job for a local contractor, and it was the break he needed as he soon established himself as a hardworking and reliable employee.

On the personal side, after being released from federal prison, Kyle rekindled his relationship with his former girlfriend, and soon she became pregnant with their daughter. They decided to move in together and Kyle began saving the money he earned from his employment for a down payment on a house. Finally, Kyle's life appeared to be moving in a very positive direction, but then tragedy struck and everything suddenly changed. His younger sibling, Krystal, who was drug addicted, passed away from an overdose, leaving behind three young children. Within a year of her passing, Kyle's brother, Chuck, also died from a drug overdose. As the only stable and income earning sibling in the family, Kyle felt a sense of obligation to

9

respect his brother and sister by holding proper funerals for them. He also decided that he and his girlfriend would assume responsibility for his young nieces and nephews. Scrambling to find quick money, Kyle foolishly resorted to the source of income he used in his younger years to procure instant cash – drug dealing. Aside from generating sufficient funds to pay for the funeral services, Kyle found himself energized by the way he was able to accomplish this challenge. Although he enjoyed his work as a plumber and earned a respectable wage, Kyle wanted to buy a home for his new family in a shorter time frame than his lawful income would allow. He figured that he'd continue to work as a plumber, but on the side, sell drugs on a smaller scale until he felt he was better situated financially. Sadly, this was the wrong approach and as a result, Kyle has lost everything. It appears his well-placed intentions led him back to the life he so desperately wanted to leave.

Unless you were raised in the environment that Kyle came from, it is hard to grasp and comprehend his mindset. Counsel is certainly not downplaying the seriousness of the Kyle's actions. However, the environment Kyle grew up in and the poor guidance he received as a youngster clearly influenced his decisions leading into adulthood. Kyle is an intelligent man and recognizes the mistakes he's made. It is counsel's hope that Kyle returns to his plumbing vocation and becomes a productive member in the community upon his release from prison.

### V. SENTENCING ARGUMENTS & CONCLUSION

Looking at Kyle's conduct on paper, it may appear that a lengthy prison sentence is warranted. However, an 87-month sentence would be significant and would reaffirm in Kyle's mind that dealing drugs is not worth the risk to sacrifice for one's freedom. While it is easy to judge Kyle on his past actions and decisions, he is a decent man with a good mind who is not afraid to roll up his sleeves and immerse himself in hard work. Since his pretrial incarceration,

Kyle has spent many hours reflecting on his past. He truly regrets his actions and remains hopeful for a better future. During his 12-months of pretrial confinement, Kyle has participated in the various treatment programming that's offered, and he's conducted himself in a positive manner.

Kyle Petersen stands convicted of a serious federal crime which requires significant punishment. A sentence of 87-months is a significant sentence to serve in a federal correctional facility, especially someone who has a young daughter who needs him at home. As cited above, a fundamental principle of sentencing is that a court "shall impose a sentence sufficient, but not greater than necessary" to meet specified sentencing goals, including the goal of "just punishment." *See* 18 U.S.C. §3553(a). It is the defendant's hope that the Court will impose such a sentence after considering all of the §3553 factors.

> Respectfully submitted,
> The Defendant – Kyle Petersen
>
> By: */s/ William H. Paetzold*
> William H. Paetzold
> Moriarty, Paetzold & Sherwood
> 2230 Main Street
> Glastonbury, CT 06033
> Tel. (860) 657-1010
> Fax (860) 657-1011
> Federal Bar No.: ct10074
> whpaetzold@mpslawfirm.com

## **CERTIFICATION**

This is to certify that the foregoing was filed electronically on June 16, 2025 to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

*/s/ William H. Paetzold*
William H. Paetzold

# EXHIBIT A

DEA Lab Reports

# EXHIBIT B

# Methamphetamine Drug Chart



**U.S. Department of Justice**
**Drug Enforcement Administration**

Northeast Laboratory
New York, NY

## Chemical Analysis Report

New Haven District Office
195 Church Street, 2nd Floor
New Haven, CT 06510

Case Number: ▮▮▮▮▮
LIMS Number: 2024-SFL2-02220

### Observations, Results and Conclusions:

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 24 | Methamphetamine (calc. as Hydrochloride) | 16.790 g ± 0.002 g | 4.5% ± 0.5% | 0.755 g ± 0.091 g |

**Remarks:**
The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

The purity and amount pure substance values are representative of the entire exhibit. All uncertainty values represent expanded uncertainty estimates at the 95% level of confidence.

Total dosage unit count = 37 tablets (net); 34.1 tablets (reserve); substance concentration: 20 mg/tablet.

### Exhibit Details:

Date Accepted by Laboratory: 04/10/2024     Gross Weight: 46.7 g     Date Received by Examiner: 04/12/2024

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 24 | 37 | Plastic Bag | Tablet | 15.502 g |

**Remarks:**

### Exhibit Analysis:

**Sampling:**

Methamphetamine identified in 9 units tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substance. A composite was formed from 15 units for further testing.

| Exhibit | Summary of Test(s) |
|---|---|
| 24 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

| Exhibit | Purity Test(s) |
|---|---|
| 24 | DEA103 / Gas Chromatography |

The terminology used in the preparation of this report is consistent with the current Department of Justice Uniform Language for Testimony and Reports for General Forensic Chemistry and Seized Drug Examinations.

**Analyzed By:** /S/ Mark V. Filandro, Senior Forensic Chemist     Date: 04/24/2024
**Approved By:** /S/ John W. McIlroy, Supervisory Chemist          Date: 04/24/2024

DEA Form 113 September 2023

PROTECTED DISCOVERY MATERIAL

USAO_000290



**U.S. Department of Justice**
**Drug Enforcement Administration**

Northeast Laboratory
New York, NY

## Chemical Analysis Report

New Haven District Office
195 Church Street, 2nd Floor
New Haven, CT 06510

Case Number: █████
LIMS Number: 2024-SFL2-02216

### Observations, Results and Conclusions:

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 20 | Methamphetamine (calc. as Hydrochloride) | 1155.1 g ± 0.2 g | 4.6% ± 0.6% | 53.1 g ± 6.4 g |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

The purity and amount pure substance values are representative of the entire exhibit. All uncertainty values represent expanded uncertainty estimates at the 95% level of confidence.

Total dosage unit count = 2,634 tablets (net); 2,631 tablets (reserve); substance concentration: 20 mg/tablet.

Total number of units is an extrapolated value.

### Exhibit Details:

Date Accepted by Laboratory: 04/10/2024        Gross Weight: 1240 g        Date Received by Examiner: 04/12/2024

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 20 | 2634 | Plastic Bag | Tablet | 1153.8 g |

**Remarks:**

### Exhibit Analysis:

**Sampling:**

Methamphetamine identified in 9 units tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substance. A composite was formed from 15 units for further testing.

| Exhibit | Summary of Test(s) |
|---|---|
| 20 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

| Exhibit | Purity Test(s) |
|---|---|
| 20 | DEA103 / Gas Chromatography |

The terminology used in the preparation of this report is consistent with the current Department of Justice Uniform Language for Testimony and Reports for General Forensic Chemistry and Seized Drug Examinations.

**Analyzed By:** /S/ Mark V. Filandro, Senior Forensic Chemist        **Date:** 04/23/2024
**Approved By:** /S/ Adriana M. DeArmas, Senior Forensic Chemist        **Date:** 04/23/2024

DEA Form 113 September 2023

| mixture weight | purity | Actual Amount of Methamphetamine | offense Level | Statutory Penalty | Amount of Dilutant | marijuana converted drug weight |
|---|---|---|---|---|---|---|
| 59.95 g | 79% | 47.36 | 28 | B1B | 12.59 g | 947.2 Kg |
| 60.72 g | 78% | 47.36 | 28 | B1B | 13.36 g | |
| 61.51 g | 77% | 47.36 | 28 | B1B | 14.15 g | |
| 62.32 g | 76% | 47.36 | 28 | B1B | 14.96 g | |
| 63.15 g | 75% | 47.36 | 28 | B1B | 15.79 g | |
| 64.00 g | 74% | 47.36 | 28 | B1B | 16.64 g | |
| 64.88 g | 73% | 47.36 | 28 | B1B | 17.52 g | |
| 65.78 g | 72% | 47.36 | 28 | B1B | 18.42 g | |
| 66.71 g | 71% | 47.36 | 28 | B1B | 19.35 g | |
| 67.66 g | 70% | 47.36 | 28 | B1B | 20.30 g | |
| 68.64 g | 69% | 47.36 | 28 | B1B | 21.28 g | |
| 69.65 g | 68% | 47.36 | 28 | B1B | 22.29 g | |
| 70.69 g | 67% | 47.36 | 28 | B1B | 23.33 g | |
| 71.76 g | 66% | 47.36 | 28 | B1B | 24.40 g | |
| 72.87 g | 65% | 47.36 | 28 | B1B | 25.51 g | |
| 74.00 g | 64% | 47.36 | 28 | B1B | 26.64 g | |
| 75.18 g | 63% | 47.36 | 28 | B1B | 27.82 g | |
| 76.39 g | 62% | 47.36 | 28 | B1B | 29.03 g | |
| 77.64 g | 61% | 47.36 | 28 | B1B | 30.28 g | |
| 78.94 g | 60% | 47.36 | 28 | B1B | 31.58 g | |
| 80.28 g | 59% | 47.36 | 28 | B1B | 32.92 g | |
| 81.65 g | 58% | 47.36 | 28 | B1B | 34.29 g | |
| 83.09 g | 57% | 47.36 | 28 | B1B | 35.73 g | |
| 84.58 g | 56% | 47.36 | 28 | B1B | 37.22 g | |
| 86.11 g | 55% | 47.36 | 28 | B1B | 38.75 g | |
| 87.71 g | 54% | 47.36 | 28 | B1B | 40.35 g | |
| 89.36 g | 53% | 47.36 | 28 | B1B | 42.00 g | 947.2 Kg |

| mixture weight | purity | Actual Amount of methamphetamine | offense Level | statutory penalty | Amount of Dilutant | marijuana converted drug weight |
|---|---|---|---|---|---|---|
| 91.08 | 52% | 47.36 | 28 | B1B | 43.72 | 947.2 kg |
| 92.87 | 51% | 47.36 | 28 | B1B | 45.51 | ↑ |
| 94.72 | 50% | 47.36 | 28 | B1B | 47.36 | |
| 96.66 | 49% | 47.36 | 28 | B1B | 49.30 | |
| 98.67 | 48% | 47.36 | 28 | B1B | 51.31 | |
| 100.77 | 47% | 47.36 | 28 | B1B | 53.41 | |
| 102.96 | 46% | 47.36 | 28 | B1B | 55.60 | |
| 105.25 | 45% | 47.36 | 28 | B1B | 57.89 | |
| 107.64 | 44% | 47.36 | 28 | B1B | 60.28 | |
| 110.14 | 43% | 47.36 | 28 | B1B | 62.78 | |
| 112.77 | 42% | 47.36 | 28 | B1B | 65.41 | |
| 115.52 | 41% | 47.36 | 28 | B1B | 68.16 | |
| 118.40 | 40% | 47.36 | 28 | B1B | 71.04 | |
| 121.44 | 39% | 47.36 | 28 | B1B | 74.08 | |
| 124.64 | 38% | 47.36 | 28 | B1B | 77.28 | |
| 128.00 | 37% | 47.36 | 28 | B1B | 80.64 | |
| 131.56 | 36% | 47.36 | 28 | B1B | 84.20 | |
| 135.32 | 35% | 47.36 | 28 | B1B | 87.96 | |
| 139.30 | 34% | 47.36 | 28 | B1B | 91.94 | |
| 143.52 | 33% | 47.36 | 28 | B1B | 96.16 | |
| 148.00 | 32% | 47.36 | 28 | B1B | 100.64 | |
| 152.78 | 31% | 47.36 | 28 | B1B | 105.42 | |
| 157.87 | 30% | 47.36 | 28 | B1B | 110.51 | |
| 163.32 | 29% | 47.36 | 28 | B1B | 116.26 | ↓ |
| 169.15 | 28% | 47.36 | 28 | B1B | 121.79 | 947.2 kg |
| 175.41 | 27% | 47.36 | 28 | B1B | 128.05 | |

| mixture weight | Purity | Amount of Actual methamphetamine | offense level | Statutory Penalty | Dilutant | marijuana converted drug weight | Ratio |
|---|---|---|---|---|---|---|---|
| 182.16 | 26% | 47.36 | 28 | B1B | 134.80 | 947.2 kg | |
| 189.44 | 25% | 47.36 | 28 | B1B | 142.08 | ↑ | |
| 197.34 | 24% | 47.36 | 28 | B1B | 149.98 | | |
| 205.92 | 23% | 47.36 | 28 | B1B | 158.56 | | |
| 215.28 | 22% | 47.36 | 28 | B1B | 167.92 | | |
| 225.53 | 21% | 47.36 | 28 | B1B | 178.17 | | |
| 236.80 | 20% | 47.36 | 28 | B1B | 189.44 | | |
| 249.27 | 19% | 47.36 | 28 | B1B | 201.91 | | |
| 263.12 | 18% | 47.36 | 28 | B1B | 215.76 | | |
| 278.59 | 17% | 47.36 | 28 | B1B | 231.23 | | |
| 296.00 | 16% | 47.36 | 28 | B1B | 248.64 | | |
| 315.74 | 15% | 47.36 | 28 | B1B | 268.38 | | |
| 338.29 | 14% | 47.36 | 28 | B1B | 290.93 | | |
| 364.31 | 13% | 47.36 | 28 | B1B | 316.95 | | |
| 394.67 | 12% | 47.36 | 28 | B1B | 347.31 | | |
| 430.55 | 11% | 47.36 | 28 | B1B | 383.19 | ↓ | |
| 473.60 | 10% | 47.36 | 28 | B1B | 426.24 | 947.2 kg | 10 to 1 |
| 526.23 | 9% | 47.36 | 30 | B1A | 478.87 | 1052.46 kg | 11.12 to 1 |
| 592.00 | 8% | 47.36 | 30 | B1A | 544.64 | 1184.00 kg | 12.5 to 1 |
| 676.58 | 7% | 47.36 | 30 | B1A | 629.22 | 1353.16 kg | 14.29 to 1 |
| 789.34 | 6% | 47.36 | 30 | B1A | 741.98 | 1578.68 kg | 16.67 to 1 |
| 947.20 | 5% | 47.36 | 30 | B1A | 899.84 | 1894.46 kg | 20 to 1 |
| 1171.80 | 4.04% | 47.36 | 30 | B1A | 1125.44 | 2343.60 kg | 24.75 to 1 |
| 1578.67 | 3% | 47.36 | 32 | B1A | 1531.31 | 3157.34 kg | 33.34 to 1 |
| 2368.00 | 2% | 47.36 | 32 | B1A | 2320.64 | 4736.00 kg | 50 to 1 |
| 4736.00 | 1% | 47.36 | 32 | B1A | 4688.64 | 9472.00 kg | 100 to 1 |
| 9472.00 | 0.5% | 47.36 | 34 | B1A | 9424.64 | 18944.00 kg | 200 to 1 |